2018-1900. Mr. Hines. May it please the Court, I am Jay Hines with the firm Muncie Geisler Olds & Low, representing appellant Wuhan Keda, a limited company of China, in this appeal from a consolidated decision of the Trademark Trial and Appeal Board in two opposition proceedings involving three applications for the Martini Acts. Opposer appellee herein is Tenax S.p.A., a joint stock company of Italy, relying on two prior registrations for Tenax. The Board found a likelihood of confusion pursuant to the predecessor court's controlling in re e.i. DuPont ruling of 1973, holding that four DuPont factors favored Tenax. The similarity of the marks, the similarity of the goods, overlapping trade channels, and class of purchasers. Well, those things are pretty clear. Tenax and Tenax certainly sound and look alike, and therefore similar materials. How can you refute that? Well, Your Honor, this court in Stonecorp Group v. Specialty Codings in 2014 held that the Board should not make up its own rules regarding pronunciation of marks. In that case, the mark was stone shield without the e between stone and shield, and the Board held that that o should be short, pronounced stone shield. The court held the Board's pronunciation analysis was not supported by substantial evidence. I think we have a comparable situation herein because the Board felt that consumers were likely to pronounce the first syllable of Wuhan, Kedahs, and Tenaxes with a long e sound, and that consumers could easily overlook the letter i in applicant's mark and not articulate it as a long e. This again ignores the ordinary rules of English and such words with the ia vowel combination, such as Brainiac, Celiac, et cetera. The Board's ruling as to the visual similarities in construction of the marks likewise favors the consonants over the vowels, again holding that consumers could easily overlook the additional e and the additional i in appellant's mark. What's our standard of review for that particular issue, namely whether visually consumers would see the marks as substantially similar or not? If I heard you correctly. What's our standard of review of the PTO's decision that consumers would visually see the marks as substantially similar or not? It's a preponderance of the evidence standard. No, that's for them. What is it for us? Substantial evidence. I think that's your problem. You're arguing to this court as though we have the right to decide by a preponderance of the evidence whether you're right or they're right. But that's not what we as the appellate court do. We have to, that's what the Board did, but now we have to review what they did for substantial evidence, which is an extremely deferential standard. So it's not good enough for you to tell me, you know, why you think I should see it differently than the Board did. You have to prove a much more deferential standard, and that's to me where you're coming up short. I mean, I'll tell you, I agree completely with you on the pronunciation. I don't see that gets you anywhere, ultimately. I don't see that that changes the outcome. For me, teeniacs, maybe it's because I have teenagers, but I see the word teen, 10x10, it's a number. I see the word 10. I probably can't imagine making the mistake the Board said customers might make. But when it comes to visual, these are fanciful words. Neither of them mean anything. Why in the world do you have to adopt a mark so close to theirs in adhesives and glues? I mean, there's nothing about these words that makes sense to me. You know, so your standard of review is substantial evidence. So you can't just tell us that you don't think they look similar or that we shouldn't think they do. You have to tell us why it was really unreasonable for the Board to conclude that they did. Well, I can see that both marks are arbitrary or coined. So they don't have any meaning with respect to the respective goods, but no meaning does not really equate to no commercial impression. Every mark has a commercial impression. And our view is that there's sufficient differences between these respective marks, that there's no potential for confusion in the marketplace. We also believe that the Board should have considered the sophistication of purchasers here. These are industrial and commercial products. They're not sold to general consumers. They're purchased by manufacturers of further products or providers of certain services from sources they know and trust. But the opposing counsel, I think that I understand their argument to me. You didn't raise this below. And in fact, Wuhan responded to the interrogatory regarding customer sophistication that it was, quote, not applicable. So if you didn't make that argument below, how is that a basis for us to vacate the lower court's decision on appeal? Well, I, again, would have to concede that this wasn't addressed below. As Judge Moore pointed out, the test is substantial evidence. And you have to show that there was no reasonable basis on which the Board could have made the decision it did. And the sounds and the names certainly look similar, and they're in the same field. So you're just arguing they should have done something different. Yes, yes, I think the same is true as to the lack of any evidence of actual confusion. I think the Board needs to take into consideration all of the facts it has before us. Here we have nearly 15 years of coexistence in multiple jurisdictions throughout the world, with the APA League not claiming a single instance where someone was confused as to the source of the goods. The Board went through the DuPont factors, and as I recall, I don't think they found any in your favor. They found many of them neutral, and several of them in favor of the likelihood of confusion. So it balanced out its analysis in favor of likelihood of confusion. Well, again, if you look at it from the viewpoint of the appellant, they prevailed in multiple foreign oppositions in other countries. The cases that the Board relied on to deem that irrelevant had to do with Paris Convention claims because of ownership of foreign registrations. They had nothing to do with foreign oppositions. From the appellant's viewpoint, they don't understand why after prevailing in now, I believe, in foreign countries under very similar likelihood of confusion analysis, why the Board... Of course, the Board isn't bound by foreign determinations. Foreign determinations may be based on different language, different usage. I'm sorry, I didn't quite hear you, Your Honor. The Board does not rely on foreign determinations, presumably because foreign languages are different and foreign usage is different? But these proceedings had to do with the same marks as herein and under very similar standards. Yes, but let me give you a poor example with regard to what Judge Lurie is saying. One of the arguments you made is that your mark has meaning in the Chinese language. That wouldn't necessarily resonate with American customers, right? Because the average American doesn't speak Chinese. But in China, maybe it isn't so much a coin term but an understood word, so that would differentiate between the two. So you see how in some countries where the language is different, they might recognize more readily a difference between two marks, but in a country where they both look like coin terms and don't mean anything to the average American who doesn't speak Chinese, then it might not be the same. Do you understand how that... I follow that perfectly well, thank you, Your Honor. Would you like to save the rest of your time for rebuttal? I would, thank you. Mr. Acosta. Good morning. May it please the Court. Matt Acosta for appellee opposer 10XSPA. Obviously I would like the panel to affirm the decision of the Board finding likelihood of confusion between the opposer's mark and the appellant mark. I think one of the important issues that I'd like to raise first is the issue of waiver. We believe two of the issues that have been raised by the appellant in this case were not addressed with the trial briefing of the Board. We didn't have a chance to respond to that argument until now, and therefore we believe that they have both been waived. The first issue, I believe it's issue three in the appellant's brief, is that the applicable channels of trade in this case are different. Now, while channels of trade were discussed by the Board, the argument that the channels of trade are different because some factual scenario outside of the registration that was not raised. The Board properly looked at the registrations and the applications to make the determination that the channels of trade would be regular and normal within the scope of the goods named in those applications and registrations. The second argument, as was mentioned earlier, that we believe was waived was as to the sophistication of the purchasers. We believe on the merits we can prevail ultimately on that point as well, but it simply wasn't raised in front of the Board, and so I think correctly they didn't find opportunity to discuss the issue and make it particularly important. And so with those waiver arguments, the next issue I want to address is just the standard of review. The entire briefing of the applicant in this case was simply a disagreement with the Board's findings, factual findings, and therefore essentially every single point that they raise on appeal is reviewed for substantial evidence, and we believe that there's plenty of evidence to support each one of the factors that the Board found in the opposer's favor, and I'm going to walk through each of those just briefly to discuss that substantial evidence. So first we have the similarity in appearance. The Board correctly, I think what the appellant is arguing here is that they made an improper side-by-side comparison, but if you read their opinion they say they're not supposed to do that and instead they apply a casual observer test, which is exactly what they're supposed to do. And so I'll give a similarity as I think are manifest in the marks. Both have a T at the beginning, both have an X at the end, both have an N in the middle, both have the vowels E and A in substantially the same place. Oh my goodness, this feels like Sesame Street. Do you really need to do this? What are your important arguments? I mean, we didn't have much dialogue with him about that. You might want to focus on the issues that we talked about. Sure. I think on that particular point, well, let me move to the similarities. Sesame Street references the letters in the back. You've heard that, right? I have little kids. Well, I mention that only because that's what the Board found, and I think if there's any confusion whatsoever you could take a casual observer. He sees it at a trade show. It says T-E-E-N-I-A-X. Well, let's focus on pronunciation. That's one thing that kind of stopped me a little bit about the Board's decision, which is ten is an established word, T-E-N. In the American dialect, I don't know it ever being called teen. I don't know a hard vowel sound ever attaching to a T-E-N word, tentative, whatever. And part of it is, for me, when I look at ten X, I think ten and X. The first thing I thought of when I saw this is, oh, I wonder if this is to, like, outdoor equipment, you know, axes or something. I wonder what this is for. But so ten is an established word in the English language. It always has a soft E. I was a little confused when the Board said somebody might look at that and read it with a hard E. Sure. Well, I think first we have to start with the fact that both of the terms, as you recognize, were coined. So if a casual... But at least ten X is made up of two known words, not being used to convey the same meaning that those words convey, but nonetheless they're understood. Well, I think we put in the brief that, for instance, there are occasions in the English language, and I can't be exhaustive, but I can say, like, premature and premature. Actually, if you go and you look at... Yes, but there's nothing with ten that works that way. Like, you know, that this is a word, an established word. Right. Well, I will tell you that I'm from Texas, and in Texas we have all kinds of pronunciations. You call it Teeksis? Is that what you're going with? We call it voir dire. So, I mean, and that's not the only example. When I was sitting by designation in the district court, the judge said to me, Good, you didn't let him at-a-cue. At-a-cue. I'm like, I didn't let him what? At-a-cue-tion? And that's exactly my point. You didn't let him at-a-cue. I'm like, oh, my goodness. What did I mess up? Certainly. Certainly. I mean, ten is a well-observed pronunciation of T-E-N. If you understand that this word is a combination of T-E-N and A-X, then, I mean, someone could use easily your logic in pronouncing it. Somebody could see it as differently. It's not ten. It's not ax. It's just a word they've never seen before. Your point is we're not dealing with teen versus ten. We're dealing with teeny ax versus ten ax. Versus ten ax. Ten ax, right. It's the whole two marks, not just pieces. Correct. Exactly. We're dealing with the whole word, and the example that I think is not far from likely is somebody, a purchaser, wants to order one of these goods. They call up their source, and they say, I would like teen ax. I would like the teen ax epoxy. What are they talking about? Who are they talking about? And if the follow-up question isn't, who do you mean, T-E-N-A-X or T-E-E-N-I-A-X, then simply a source, if they have these two branded products, is assuming a pronunciation, is assuming what product they're talking about. Now, you said you could imagine a set of circumstances where this occurred. How long have these products been coexistent in the market? Well, there's a difference, but there is, first of all, no evidence in the record of, for example, these products being side by side at a trade show. You described a scenario where somebody calls up somebody, so I don't think they have to be side by side on a telephone. So how long have these products both been on the market? I believe our product has been on the market for certainly more than 30 years. And there's, you know, about, right. So 14 years. Now, you can imagine somebody calling up and having this confusion saying T-N-A-X and not knowing which one. But for 14 years, these products have coexisted on the market, and there's no evidence in this record that anything like that's ever occurred. Is there? That there's been actual confusion? Well, I think that's an issue that I'd like to address, and that, yes, there is no evidence of lack of actual confusion. Is there any evidence of actual confusion? Of actual confusion. You say, I can imagine a set of circumstances where somebody would call and say this confusing thing, but there's no evidence that anything ever occurred in the 14 years these products have both been on the market. Is there? Well, we don't actually know exactly how much they've actually overlapped. And also, quite frankly, that's not the test. I'm confused. What do you mean we don't know how much they've actually overlapped? What do you mean by that? Well, for example, in the, I'm going to say, University of South Carolina versus University of Southern California case, one of the biggest talking points by this court was, you know, how would we possibly have actual confusion when in a lot of circumstances. And there, in that case, there was actually evidence of at least one instance of actual confusion. And there the court simply says, you know, there wasn't enough overlap that we saw in the record between these two marks being in the same place at the same time to actually give too much weight to the lack of actual confusion. And I think. The board said the test is likelihood of confusion, not actual confusion. That's right. That's right. And also, the extent that Wuhan is actually in the market is really unclear from the record. If you look at their response to interrogatory 14, they say Wuhan has no record of advertising expenses in the United States. I'm not quite sure how you have no record of advertising expenses, but that's what they said. Interrogatory 15, Wuhan does not intend to advertise its goods in the United States. I mean, there's all these conditions which you can say, OK, well, you know, where would these things be at the same place in the same time? What I suspect, and this is just my suspicion, is that the suppliers are going to be somewhere outside of the United States, but their contacts are going to be inside the United States. And so, I mean, quite frankly, the likelihood happens when these two marks exist in the marketplace with basically exactly overlapping goods, which is the case here. The registration and the application. Opposer's mark applies to epoxy in the graveyard sector. Applicant chose to register his mark or apply for his mark with epoxy in the commercial sector. And obviously, the umbrella of commercial use of epoxy encompasses epoxy for the commercial use in the graveyard sector. So there we have overlapping goods. And yes, we have customers in the United States. And so to the extent that Wuhan has any significant presence with this overlapping mark, if it were to be allowed, then there is, in fact, the likelihood of confusion. And I would say maybe not for those who view or maybe not for those who say the marks in concurrence with each other and in addition have the view that TEN always means 10 and AX always is pronounced axe. But the likelihood is certainly there. That's what was found by the board. And it was correctly found. Now let me. Were any of the DuPont factors found to favor appellant? No. All of the other DuPont factors were neutral as the board found. So the similarity of goods. Are in favor of likelihood. Correct. The similarity of goods, the similarity of trade channels, and also the similarity in appearance. Sound and meaning. Those all favored likelihood of confusion. The rest of the factors were neutral. So even if maybe I personally disagreed with the pronunciation point, all of the mountain, there's like a mountain of evidence that goes in one direction and absolutely not a single piece that goes the other way, at least according to the board's findings. So even if I had fault with this one tiny little aspect of the decision, that wouldn't be enough on appeal under the standard of review for me to change anything, right? Absolutely. There would be harmless error. Quite frankly, I think you'd probably have to disagree with every single one of the findings of the board in order for there to be actual harmful error. Just because of the, I mean, it's the overwhelming opinion of the board that the marks are likely to be confused. But let me. Do you have any idea why so many foreign jurisdictions have granted full harm of registration to the TENIACs? The only thing I can speculate is that the case law is. If you don't know, then that's fine. No, I have no idea. I have read some of the opinions in those cases that were part of the record. And some of them, you know, really don't discuss the factors as in. Which countries do they come from? I can't remember exhaustively, but I believe it's China, Thailand. In other words, not necessarily English language countries. No, absolutely not. In fact, I believe most of them are either Spanish-speaking countries or Southeast Asian countries or Asian countries. And so not predominantly English speaking. But in addition to that, the weight of the factors is different. As Judge Moore indicated, the appellant is arguing that this mark somehow developed from T-E-N-I-C-E. And T-E means something in Chinese. And then they use the English word nice. On that point, we would simply say that if you apply that to either good faith or that there's some inherent meaning in English to that word, those aren't the marks that were applied for. T-E-N-I-C-E, that wasn't in the applicant's application. Somehow, and we don't, it's not even clear in the record how this happened. If they were considering that earlier mark, somehow it translated or it ended up as T-E-E-N-I-A-X. And that's what they applied for. So any argument about good faith or that there's some established meaning based on that history is simply irrelevant because the mark that the court and the board has for it is T-E-E-N-I-A-X. The last point I'll make in my final 30 seconds is the point that the appellant is making about the lack of confusion. I think the only piece of evidence they point to is that one line in the declaration of their general manager. But as Judge Moore pointed out in the record, and there are several instances of this, especially in the responses to the interrogatories, there's no way that they would know about lack of confusion. They didn't do any investigation. They didn't perform any studies. So simply, 10 years ago, me declaring that I have no knowledge of lack of confusion doesn't move the ball anywhere. It's irrelevant, as the board found. And for those reasons, the decision to not register the mark should be affirmed. Thank you. Thank you. Counsel, Mr. Hines has some rebuttal time, if you need it. Your Honors, I will waive appellant's rebuttal time. Thank you. Thank you. The case is submitted.